OPINION
{¶ 1} Appellants, Matt Malkamaki ("Malkamaki"), Monterey Bay Builders, Inc. and Hidden Harbor Construction, Inc., appeal from the June 8, 2001 judgment entry of the Lake County Court of Common Pleas in favor of appellee, Sharleen Connolly.
 {¶ 2} Appellee had been employed by Malkamaki to sell condominium units in a development he had built. Malkamaki terminated appellee in 1999. She filed a complaint on February 28, 2000, alleging breach of contract, partial performance, fraud, promissory estoppel, unjust enrichment, and that Malkamaki was indistinguishable from the corporate entities, Monterey Bay Builders, Inc. and Hidden Harbor Construction, Inc. A jury trial was held commencing on May 14, 2001 and concluding on May 16, 2001.
 {¶ 3} At trial, appellee testified that she met Malkamaki when she was employed as a realtor at Falvey Realty. Malkamaki was a builder, and appellee worked on his account. According to appellee, they had a close friendship that included trips with appellee, her husband, Malkamaki, and his wife, to Las Vegas, the Bahamas, and Niagara Falls.
 {¶ 4} Appellee further testified that in February 1998, she and Malkamaki discussed the possibility of appellee working for Malkamaki. Malkamaki needed a sales representative for a development that he had built, Monterey Bay. At a second meeting that same month, appellee told him that she would work on Monterey Bay, but only if she could subsequently work on Hidden Harbor, a project that was in the planning stage at that point. Most of the units at Monterey Bay had already been sold. There were only thirty units remaining, and appellee understood that they would be difficult to sell.
 {¶ 5} At that time, appellee was working for Klinger Realty. Her broker was to receive $300 per transaction, and appellee would receive a commission of one-half percent. After appellee had sold approximately three units at Moneterey Bay, Malkamaki decided to place appellee on his payroll so that he would not have to pay the broker's fees, and her commission was reduced to eight-tenths of one percent. When appellee sought to have her agreement with Malkamaki reduced to writing, he told her that if she did not trust him, she should not work for him.
 {¶ 6} While working on Monterey Bay, appellee also sold single-family homes for Shandle Builders. In 1998, appellee earned approximately $38,000 from selling homes for Shandle Builders and $38,000 from her Monterey Bay sales. In November 1998, the other realtor working on Monterey Bay quit. There were approximately nine units remaining to be sold. At trial, appellee alleged that Malkamaki promised to employ her to sell units at Hidden Harbor if she continued to work on Monterey Bay. In 1999, appellee earned $14,000 selling Monterey Bay units. After her co-worker quit, there was a three-month period when appellee made no sales and received no compensation. The last Monterey Bay unit sold in approximately July 1999. Malkamaki terminated appellee in October 1999.
 {¶ 7} Christine Gallowan ("Gallowan"), who was Malkamaki's secretary and stepdaughter, testified that appellee believed that she would work on the Hidden Harbor project and that for appellee to receive the Hidden Harbor project, she had to complete the Monterey Bay project. Gallowan also stated that appellee worked hard on the Hidden Harbor project and assisted with the development of the project. She further indicated that appellee was terminated by Malkamaki, in part because she spoke with his wife regarding his marital infidelities, and, in part, because she had not pre-sold any Hidden Harbor units.
 {¶ 8} Malkamaki testified that he did not have an oral agreement with appellee that she could sell Hidden Harbor units, and that it was not until July 1999, that he committed to having her sell units at Hidden Harbor. He also stated that he terminated appellee because of the lack of sales at Hidden Harbor and because of her knowledge of an affair he was having.
 {¶ 9} At the close of appellee's case, and at the close of their case, appellants' moved for directed verdicts on the breach of contract, on partial performance, on piercing the corporate veil, and on punitive damages. The trial court granted appellants' motion for a directed verdict on appellee's claim for punitive damages and overruled the remaining motions. The jury found in favor of appellee on her breach of contract claim, promissory estoppel claim, and piercing the corporate veil claim. The jury found for appellants on appellee's fraud claim. It awarded appellee $64,000 in damages.
 {¶ 10} In its June 8, 2001 judgment entry, the trial court entered a judgment in favor of appellee in the amount of $64,000. Malkamaki, Monterey Bay Builders, Inc., and Hidden Harbor Construction Company were held jointly and severally liable. Appellants have filed a timely appeal and make the following three assignments of error:
 {¶ 11} "[1.] The trial court erred by denying appellants' motion for a directed verdict on appellee's breach of contract claim due to the statute of frauds.
 {¶ 12} "[2.] The trial court erred in denying appellants' motion for a directed verdict on appellee's promissory estoppel claim (or, alternatively, the jury's decision was against the manifest weight of the evidence).
 {¶ 13} "[3.] The trial court erred by denying appellants' motion for a directed verdict on appellee's claim of piercing the corporate veil, (or alternatively, the jury's decision was against the manifest weight of the evidence)."
 {¶ 14} Appellants' first and second assignments of error are interrelated and will be treated in a consolidated fashion. In their first assignment of error, appellants argue that the trial court should have granted their motion for a directed verdict on appellee's breach of contract claim because the oral agreement pursuant to which she was employed violated the statute of frauds. In their second assignment of error, appellants contend that the trial court erred in failing to grant their motion for a directed verdict on appellee's promissory estoppel claim.
 {¶ 15} With respect to the granting or denial of a directed verdict, this court stated in Darroch v. Smythe, Cramer Co. (Apr. 3, 1998), 11th Dist. No. 96-L-212, 1998 WL 258422, at 3, "a trial court may not grant a directed verdict unless the evidence, when construed in the light most favorable to the nonmoving party, leads reasonable minds to only one conclusion, and that conclusion is adverse to the nonmovant. Civ.R. 50(A), therefore, requires the trial court to give the nonmoving party the benefit of all reasonable inferences that may be drawn from the evidence. Broz v. Winland (1994), 68 Ohio St.3d 521, 526; Keeton v.Telemedia Co. of S. Ohio (1994), 98 Ohio App.3d 405, 408. If there is sufficient credible evidence to permit reasonable minds to reach different conclusions on an essential issue, then the trial court must submit that issue to the jury. O`Day v. Webb (1972), 29 Ohio St.2d 215, paragraph four of the syllabus; Campbell v. Colley (1996),113 Ohio App.3d 14, 18." (Parallel citations omitted.)
 {¶ 16} The first issue this court will address in connection with appellants' first two assignments of error is whether appellee presented sufficient credible evidence to survive appellants' motion for a directed verdict on her promissory estoppel claim. Four elements are required to establish a claim of promissory estoppel: (1) a clear and unambiguous promise; (2) reliance on the promise; (3) the reliance is reasonable and foreseeable; and (4) the party relying on the promise was injured by his or her reliance. Patrick v. Painesville Commercial Properties, Inc.
(1997), 123 Ohio App.3d 575, 583.
 {¶ 17} Here, appellee testified that she told Malkamaki in Feburary 1998, that she would not accept the Monterey Bay project unless she was also promised that she would be permitted to work on the Hidden Harbor project. According to appellee's testimony, Malkamaki told her she would definitely work on the Hidden Harbor project. She further stated that, on the advice of Gallowan, she cancelled vacation plans in anticipation of the start of the Hidden Harbor project in April 1999. In August 1999, Malkamaki indicated that, in connection with the Hidden Harbor project, appellee would receive a commission of 1.25 percent on any presale and two percent on any units sold after the construction of the model.
 {¶ 18} Gallowan also testified that appellee discussed the Hidden Harbor project in the presence of herself and Malkamaki. Gallowan encouraged appellee to believe that she would receive the project. Gallowan also heard Malkamaki promise her the Hidden Harbor Project. It was Gallowan's understanding that Malkamaki had made a commitment to appellee in the summer of 1999, that she would be a sales representative for the Hidden Harbor project. Finally, Gallowan testified that she believed that if appellee did a good job on Monterey Bay, she would receive the Hidden Harbor project.
 {¶ 19} All of this testimony supports appellee's contention that Malkamaki promised to allow her to work on the Hidden Harbor project, that she relied on his promise, and that, under the circumstances, her reliance was reasonable.
 {¶ 20} As to the detriment suffered by appellee, she testified that toward the end of the Monterey Bay project, from October 1998 through March 1999, she did not sell any units, and, therefore, received no compensation. However, she continued to work on Monterey Bay in reliance on the fact that she would ultimately work on the Hidden Harbor project. Appellee also testified that she turned down a project with Shandle Builders involving two hundred and eighty lots in Middlefield, because she could not simultaneously work on that project and Monterey Bay. She also forfeited her customer list and, consequently, her sphere of influence that she had built during her many years as a realtor. Appellee clearly suffered a detriment in continuing to work on Monterey Bay after most of the units had been sold. It is evident that she would have left at that point but for Malkamaki's promise of retaining her for the Hidden Harbor project. In view of the foregoing, we conclude that the trial court did not err in denying appellants' motion for a directed verdict on appellee's promissory estoppel claim.
 {¶ 21} Appellants also assert that appellee's agreement with Malkamaki violated the statute of frauds. R.C. 1335.05 provides that "[n]o action shall be brought whereby to charge the defendant, upon a special promise * * * or upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized." Appellee freely admits that her agreement with Malkamaki was never reduced to writing. Further, the record before us suggests that the agreement between appellee and Malkamaki could not be performed within one year from its making; therefore, it violated the terms of R.C. 1335.05.
 {¶ 22} However, it is well-established in Ohio that the doctrine of promissory estoppel can overcome or rebut the statute of frauds.DeCavitch v. Thomas Steel Strip Corp. (1990), 66 Ohio App.3d 568, 572. InGathagan v. Firestone Tire Rubber Co. (1985), 23 Ohio App.3d 16,18, the Ninth Appellate District cited Section 217A of the Second Restatement of Contracts for the proposition that, notwithstanding the statute of frauds, an oral promise is enforceable if injustice cannot otherwise be avoided. The Tenth Appellate District visited this issue in a case involving an oral agreement to pay residuals for an indefinite period in the future. Daup v. Tower Cellular, Inc. (2000),136 Ohio App.3d 555, 566. The Daup court noted that such an agreement falls within the statute of frauds, but that the statute of frauds can be overcome or rebutted by the doctrine of promissory estoppel. Id.
 {¶ 23} The Eighth Appellate District has narrowed the promissory estoppel exception to the statute of frauds by adding the requirement that there be either (1) a misrepresentation that the statute's requirements have been complied with or (2) a promise to make a memorandum of the agreement. McCarthy, Lebit, Crystal Haiman Co.,L.P.A. v. First Union Mgt., Inc. (1993), 87 Ohio App.3d 613, 627. TheMcCarthy, Lebit court reasoned that its approach encouraged those in business to reduce their agreements to writing. Id.
 {¶ 24} We are not inclined to apply the Eighth Appellate District's logic in the instant matter. In McCarthy, Lebit, the parties were a law firm and its landlord. The law firm had filed a complaint for breach of an oral lease agreement. Certainly, we can sympathize with the Eighth District's frustration at the inability of a large, sophisticated law firm, located on Public Square in downtown Cleveland, to reduce its lease agreement to writing. However, it would be patently unfair to hold employees, who have been hired on a handshake agreement, to the same standard of business and legal sophistication. Applying the doctrine of promissory estoppel as set forth in Gathagan, we conclude that the trial court properly denied appellants' motion for a directed verdict on this issue.
 {¶ 25} Appellants also contend that the trial court's decision was against the manifest weight of the evidence. This court will not reverse judgments supported by competent, credible evidence as being against the manifest weight of the evidence. Gerijo, Inc. v. Fairfield (1994),70 Ohio St.3d 223, 226. Here, as previously discussed, there was sufficient competent and credible evidence presented by appellee to establish her promissory estoppel claim. In sum, the oral agreement at issue here was removed from the operation of the statute of frauds by virtue of promissory estoppel, and appellants' first and second assignments of error are without merit.
 {¶ 26} In their third assignment of error, appellants contend that the trial court erred in denying their motion for a directed verdict on appellee's claim that Malkamaki should be jointly and severally liable with Monterey Bay Builders, Inc. and Hidden Harbor Construction, Inc., or alternatively, that the jury's decision was against the manifest weight of the evidence. Although appellants have styled their third assignment in part as being against the manifest weight, it is evident that they really advance their argument as one which sounds in the sufficiency of the evidence as it relates to the issues of piercing the corporate veil.
 {¶ 27} Typically, shareholders, officers, and directors are not liable for the debts of the corporation. Belvedere Condominium UnitOwners' Assn. v. R.E. Roark Cos., Inc. (1993), 67 Ohio St.3d 274, 287. However, the corporate form may be disregarded and shareholders, officers, and directors held liable for corporate misdeeds when "(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control or wrong." Id. at 289; Bucyrus-Erie Co. v. Gen. Products Corp.(C.A.6, 1981), 643 F.2d 413,418.
 {¶ 28} In the matter sub judice, appellee has clearly failed to meet the second prong of the Belvedere test. Appellee is contending that the fraud or illegal act committed by Malkamaki was his breach of their oral agreement. Breach of contract alone is not sufficient to bring a corporation's conduct within the scope of Belvedere.
 {¶ 29} Appellee suggests that a broader reading of Belvedere is required, as outlined by the Third Appellate District in Wiencek v.Atcole Co., Inc. (1996), 109 Ohio App.3d 240. The Wiencek court held that a party seeking to pierce the corporate veil "may present evidence that the shareholders exercised their control over the corporation in such a manner as to commit a fraud, illegal, or other unjust or inequitable act upon the person seeking to disregard the corporate entity in order to satisfy the second prong of the test enunciated in Belvedere." Id. at 245.
 {¶ 30} In Weincek, the plaintiff was a former employee who was seeking to recover a commission that was allegedly due to him. The trial court had granted the majority shareholders' motion for a directed verdict on the issue of whether the corporate form could be disregarded. In reversing the trial court's decision, the Third Appellate District noted that the majority shareholders had given themselves large bonuses, used corporate funds to pay for improvements on their personal residence, and purchased a recreational vehicle, which they used for personal purposes, in the corporate name. Id. at 245-246. The court concluded that the corporation's profits could have been so depleted by these expenditures that the plaintiff was prevented from receiving the commission due to him. Id. at 246. Therefore, the plaintiff suffered harm as a result of the shareholders' abuse of the corporate structure.
 {¶ 31} In the instant matter, the record does not provide any evidential basis to establish that Malkamaki acted other than in an agency capacity for the corporate entities with respect to his dealings with appellee, and that he so controlled either or both of the corporate entities that they had no separate existence. Also, Malkamaki's decision to breach the contract with appellee appears to have been entirely unrelated to his conduct with respect to the two corporate entities at issue.
 {¶ 32} Further, appellee has failed to suggest that, even if Malkamaki exercised dominion and control over the corporations, his exercise of dominion and control created an unjust or inequitable result, in terms of appellee's circumstances, different than would have been the case if Malkamaki would have simply acted in a managerial capacity.
 {¶ 33} Finally, there is no indication that he has manipulated his corporate accounts in a manner that would prevent appellee from recovering on a judgment entered against the entities. In sum, there is no suggestion that Malkamaki's alleged abuse of the corporate structure resulted in a detriment to appellee. Therefore, even under the broader reading of Belvedere suggested by Wiencek, appellee would be unable to pierce the corporate veil in this case.
 {¶ 34} A simple breach of contract, in the absence of a more substantial factual predicate indicative of some corporate malfeasance, with direct bearing on the plaintiff's injury, is insufficient to meet the second prong of the Belvedere test. To decide otherwise, would completely vitiate the holding in Belvedere. Therefore, having construed the evidence in the light most favorable to appellee, we conclude that she has failed to identify any portion of the record that would provide evidence in support of her contention that she met the second prong of the Belvedere test for piercing the corporate veil. In view of our holding, the trial court erred in failing to grant appellants' motion for a directed verdict on this issue. Additionally, there was insufficient evidence presented by appellee to support the conclusion that she should be permitted to pierce the corporate veil, particularly with respect to the second prong of the Belvedere test. Consequently, appellants' third assignment of error is well-taken.
 {¶ 35} For the foregoing reasons, the decision of the Lake County Court of Common Pleas is affirmed in part, and reversed in part. The judgments against Monterey Bay Builders, Inc. and Hidden Harbor Construction, Inc. are affirmed. The judgment against Malkamaki on the theory of piercing the corporate veil is reversed. Judgment is entered for Malkamaki on the issue of piercing the corporate veil; he is not personally liable in this matter.
ROBERT A. NADER, J., DIANE V. GRENDELL, J., concur.